# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 5, 2019       Decided January 31, 2020

No. 18-3019

UNITED STATES OF AMERICA,
APPELLEE

v.

ELIU ELIXANDER LORENZANA-CORDON,
APPELLANT

———

Consolidated with 18-3033

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:03-cr-00331-CKK-13)
(No. 1:03-cr-00331-CKK-14)

———

*Robert E. Cappell* argued the cause and filed the briefs for appellants.

*Michael A. Rotker*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Arthur G. Wyatt*, Chief, Narcotic and Dangerous Drug Section. *Ross*

*B. Goldman* and *Charles Miracle*, Attorneys, and *Elizabeth Trosman*, Assistant U.S. Attorney, entered appearances.

Before: TATEL, MILLETT, and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Following a three-week trial, a jury convicted Eliu Lorenzana-Cordon and Waldemar Lorenzana-Cordon—brothers and Guatemalan nationals—of conspiring to traffic wholesale quantities of cocaine into the United States. Now challenging their convictions, the brothers argue that the government's trial evidence materially diverged from the indictment and that the district court erred by refusing to give a multiple conspiracies jury instruction. Reviewing the record, we find no grounds for reversal: no material divergence occurred and, even if a multiple conspiracies instruction was in order, its omission inflicted no prejudice.

## I.

In 1995, Otto Herrera—a Guatemalan narcotics trafficker who worked for the Sinaloa Cartel, a Mexican drug syndicate—approached members of the Lorenzana-Cordon family with a proposal to turn the family's properties in Guatemala into makeshift airfields and warehouses where drug organizations "could store and safeguard cocaine shipments . . . until the Mexican drug traffickers could come pick them up." Trial Tr. 27 (Mar. 1, 2016, 2:00 PM). In exchange, traffickers would pay the family a fee for each load held at the properties. The family, including brothers Eliu and Waldemar, met with Herrera and approved the deal. Colombian suppliers then began transporting thousands of kilograms of cocaine to a farm owned by the Lorenzana-Cordon family for delivery to Mexican purchasers. Although aware of the arrangement, the brothers were initially uninvolved in the trafficking activities.

That changed in 1998, when Herrera moved the operation to a different farm owned by the family, at which point the brothers took on more active roles. Following the move, the brothers facilitated several cocaine transactions, with Eliu offloading shipments and Waldemar serving as a lookout—the cocaine ultimately destined for the United States by way of Mexico and the Sinaloa Cartel. Around this time, the brothers, through Herrera, also struck a deal with Colombian suppliers to purchase a portion of the cocaine being stored on the family's properties in order to resell it to their own customers. The arrangement proved profitable, with both Eliu and Waldemar buying and then selling hundreds of kilograms of cocaine.

In 2003, the family's arrangement with Herrera abruptly ended when U.S. law-enforcement officials discovered the location of Herrera's stash house in Guatemala. Local law-enforcement officials executed a search of the house, recovering a cache of weapons and U.S. currency. The raid effectively ended Herrera's trafficking activities.

Needing fresh supplies of cocaine, in 2004, the brothers met with Marllory Chacon, a Guatemalan woman who laundered money for Colombian cartels and who offered the brothers the opportunity to acquire over a ton of cocaine from Colombian suppliers. The brothers agreed to purchase the cocaine, with Eliu fronting the money and Waldemar arranging the logistics. Additional purchases followed, but the arrangement ended after the brothers made late payments to the Colombians. In 2008, Eliu and Waldemar reconnected with Chacon, enlisting her help to launder and transfer millions of dollars out of Guatemala.

Some years earlier, in either 2005 or 2006, the brothers also purchased cocaine from Jose Handal, a Honduran

trafficker. The brothers met with David Andrade, Handal's intermediary, at a farm in Honduras where they loaded several hundred kilograms of cocaine into the hidden compartment of a cattle truck and then drove the truck across the border into Guatemala. Several days later, the brothers returned to Honduras to deliver several million dollars as payment.

Throughout this period, Eliu and Waldemar continued selling wholesale quantities of cocaine to various customers. But they typically did so separately. For example, Walter Merida, a Guatemalan involved in trafficking cocaine and manufacturing ephedrine, purchased thousands of kilograms of cocaine from Eliu though he never bought from Waldemar. The brothers even occasionally competed for sales. Sebastiana Cotton, a Guatemalan trafficker who purchased cocaine from both Eliu and Waldemar, testified that, at one point, Waldemar offered to undercut Eliu's prices.

Eventually, the brothers came to the attention of U.S. law-enforcement officials, and, in 2009, a federal grand jury issued a sealed indictment charging Eliu and Waldemar, among others, with one count of conspiring to "import into the United States" and to "manufacture and distribute" for import into the United States five kilograms or more of cocaine in violation of 21 U.S.C. §§ 952, 959, 960(b)(1)(B)(ii), and 963. Third Superseding Indictment (Indictment), Joint Appendix (J.A.) 457–58. The Indictment further specified that the brothers conspired "with each other, and with other co-conspirators, both known and unknown to the Grand Jury" in "the Republic of Colombia, El Salvador, Guatemala, Mexico, and elsewhere." *Id*. Guatemala extradited the brothers to the United States and, following a trial at which they were the sole co-defendants, a jury convicted both Eliu and Waldemar on the conspiracy count.

The brothers filed a host of post-trial motions before the district court, seeking various forms of relief including new trials and the unsealing of the Indictment. The brothers also filed petitions for relief with this court, seeking to unseal various trial and grand jury materials pending appeal. The district court and a motions panel of this court denied the brothers' requests. The district court sentenced both Eliu and Waldemar to life imprisonment, and this consolidated appeal followed.

## II.

Despite the flurry of post-trial motions, the brothers advance only two arguments on appeal: that the evidence presented at trial materially diverged from the charges contained in the Indictment and that the district court erred by refusing to give a multiple conspiracies instruction to the jury. We address each in turn.

## A.

Our court recognizes two types of impermissible divergences between indictment and proof: variances and amendments. We explained the difference between the two in *Gaither v. United States*, 413 F.2d 1061 (D.C. Cir. 1969):

> An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment.

*Id*. at 1071 (internal citations omitted). Whereas "[a]n amendment is thought to be bad because it deprives the defendant of his right to be tried upon the charge in the indictment as found by the grand jury," "[a] variance is thought to be bad because it may deprive the defendant of notice of the details of the charge against him and protection against reprosecution." *Id*. at 1071–72. Amendments and variances have their "own standards governing prejudice." *Id*. at 1071. Variances warrant reversal only when "the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). But "the concept of harmless error has not been applied to amendments," requiring reversal even absent a showing of prejudice. *Gaither*, 413 F.2d at 1072; *see Baugham*, 449 F.3d at 175 (same).

Here, the brothers contend that the government's evidence materially diverged from the Indictment's charges in four ways: (1) whereas the government presented evidence of the brothers' activities in Honduras, the Indictment never specified that the conspiracy occurred there; (2) whereas the government presented evidence of the brothers' transactions with Cotton, Chacon, Andrade, and Merida, the Indictment never identified those individuals as the brothers' co-conspirators; (3) whereas the government presented testimony of Merida's involvement in manufacturing ephedrine, the Indictment never charged the brothers with conspiring to manufacture ephedrine; and (4) whereas the government presented testimony of Chacon's money laundering, the Indictment never charged the brothers with conspiring to launder money. Complicating our review of these claims, the brothers refer to the four purported divergences interchangeably as variances and amendments throughout their briefs. Fortunately, we need not determine whether the brothers' divergence claims are best understood as

amendments or variances because, however framed, the arguments fail on the merits.

The brothers' first two divergence claims—premised on the government's evidence regarding where and with whom they conspired—fall at the first hurdle because such evidence did not even diverge from the Indictment. Evidence that the brothers conspired with individuals unnamed in the Indictment (Cotton, Chacon, Andrade, and Merida) and in locations unenumerated in the Indictment (Honduras) fell squarely within the charged conduct—specifically, those portions of the Indictment charging the brothers with conspiring with persons "both known *and unknown* to the Grand Jury" in "the Republic of Colombia, El Salvador, Guatemala, Mexico, *and elsewhere*." Indictment, J.A. 457–58 (emphasis added). Because the charging terms encompassed the government's evidence, no divergence occurred, much less an amendment or variance. Of course, indictments must contain sufficient detail for defendants "to understand the charges, to prepare a defense, and . . . to be protected against retrial on the same charges," *United States v. Mejia*, 448 F.3d 436, 445 (D.C. Cir. 2006) (internal quotation marks omitted), and the Indictment met that threshold here, *see United States v. Camara*, 908 F.3d 41, 47 (4th Cir. 2018) (holding that an indictment's use of "and others" provided adequate notice); *United States v. Roman*, 728 F.2d 846, 853 (7th Cir. 1984) (concluding that an indictment's use of "and elsewhere" provided adequate notice).

The brothers' remaining divergence claims—premised on Merida's testimony regarding ephedrine and Chacon's testimony regarding money laundering—fare no better.

First, such evidence did not alter "the charging terms of the indictment . . . either literally or in effect." *Gaither*, 413 F.2d at 1071. No "literal" amendment of the Indictment

occurred because the charging terms remained unchanged "after the grand jury . . . last passed upon them." *Id*. Nor did the government's evidence "effect[ively]" alter the Indictment—commonly called a "constructive amendment." *Id*. at 1071–72. "To support a claim of constructive amendment," the defendant must "show that the evidence presented at trial *and* the instructions given to the jury so modif[ied] the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Toms*, 396 F.3d 427, 436 (D.C. Cir. 2005) (internal quotation marks omitted). Here, the district court specifically instructed the jury that

> for you to find a defendant guilty of conspiracy, the Government must prove . . . that the defendant knowingly and willfully joined and participated in the conspiracy with the specific intent to commit a criminal objective, namely, to import cocaine into the United States, or to manufacture or distribute cocaine for the purpose of the unlawful importation into the United States.

Trial Tr. 21–22 (Mar. 17, 2016). Thus, regardless of Merida and Chacon's testimony, no constructive amendment occurred because "[t]he instructions . . . required the jury to find that [the brothers] w[ere] engaged in a conspiracy to [import cocaine or manufacture and distribute cocaine for import], as alleged in the indictment." *Toms*, 396 F.3d at 436; *cf. United States v. Shmuckler*, 792 F.3d 158, 162 n.4 (D.C. Cir. 2015) (explaining that the government charges in the conjunctive and the court instructs in the disjunctive).

Second, Merida and Chacon's testimony did not materially vary from the Indictment. As noted, only variances that have a "substantial and injurious effect or influence in determining the

jury's verdict" warrant reversal. *Baugham*, 449 F.3d at 174 (internal quotation marks omitted). Neither Merida nor Chacon's testimony so prejudiced the brothers. They suffered no harm from Merida's testimony because, as the government points out, "the[] witness[] w[as] testifying about [his] *own* criminal conduct" and nothing in the record connected the brothers to Merida's ephedrine manufacturing. Appellee's Br. 44. And although Chacon, unlike Merida, implicated the brothers by testifying about their money laundering, "it simply was not the case that the jury here was substantially likely to consider against the [brothers] evidence of [money laundering] not charged in the indictment," given the overwhelming evidence of cocaine trafficking, which dwarfed Chacon's passing testimony regarding money laundering, and given the district court's instructions regarding the permissible grounds for conviction. *United States v. Straker*, 800 F.3d 570, 593 n.4 (D.C. Cir. 2015) (per curiam).

**B.**

This leaves the brothers' claim that the district court erred by rejecting their request for a multiple conspiracies jury instruction. "We review de novo th[e] failure to provide a requested jury instruction." *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008). In *United States v. Cross*, 766 F.3d 1 (D.C. Cir. 2013), we explained that, "[a]s with any other theory-of-defense instruction, a multiple conspiracies instruction 'is in order if there is sufficient evidence from which a reasonable jury could find for the defendant on his theory.'" *Id*. at 4 (quoting *United States v. Moore*, 651 F.3d 30, 78 (D.C. Cir. 2011) (per curiam)). But the refusal to give a requested charge "requires reversal of a conviction only if the defendant suffered prejudice as a consequence." *Id*. at 5.

The brothers contend that, even if the government's evidence established the single conspiracy charged in the Indictment, the record also contained enough evidence of separate conspiracies to warrant a multiple conspiracies instruction. As evidence that multiple conspiracies existed, the brothers point out that they sold cocaine separately and sourced cocaine from diverse suppliers. Although we have held that a single conspiracy to distribute narcotics exists even where co-conspirators "sometimes competed with each other for sales," *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996), and even where co-conspirators relied on "different suppliers," *United States v. Maynard*, 615 F.3d 544, 554 (D.C. Cir. 2010), we have also observed that such evidence can indicate a lack of interdependence among purported co-conspirators, warranting a multiple conspiracies instruction, *see, e.g.*, *United States v. Mathis*, 216 F.3d 18, 24–25 (D.C. Cir. 2000) (finding multiple conspiracies instruction warranted where evidence showed no interdependence among competing suppliers of narcotics).

But we need not decide whether the record here required a multiple conspiracies instruction because even if one was in order, reversal is unwarranted given that the brothers fail to "show that the [error] substantially prejudiced them." *Id*. at 25 (internal quotation marks omitted). In *Cross*, we explained that defendants may be prejudiced by the failure to give a multiple conspiracies instruction where: (1) "insufficient evidence [existed] for a reasonable jury to find [the defendants] guilty of the conspiracy charged in the indictment beyond a reasonable doubt;" (2) a lack of notice "interfere[d] with either . . . the accused['s ability] . . . to present his defense" or to "protect[] against another prosecution for the same offense;" or (3) evidence "spill[ed] over" from "one [defendant] to another" or from "one conspiracy . . . [to] another." *Cross*, 766 F.3d at 5–7 (internal quotation marks and citations omitted).

According to the brothers, "[t]he prejudice in this case was lack of notice," as they were unable "to present their defense and not be surprised at trial" and unable to "protect[] in the future from prosecution for the same offense." Appellants' Br. 29. This claim finds no support in the record.

First, "[w]hile [the brothers] assert that they were unable to prepare a defense, they fail to say how this was so." *United States v. Morris*, 700 F.2d 427, 430 (1st Cir. 1983). The Indictment apprised the brothers of the "precise offense[] of which [they were] accused" and "'set forth all the elements necessary to constitute the offence,'" *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)), putting the brothers on notice of the need to defend against the charge at trial. Moreover, they had "notice of the scope of the evidence that would be used against [them] at trial," *United States v. Sanders*, 778 F.3d 1042, 1050 (D.C. Cir. 2015), because, per order of the district court, the government provided defense counsel with Jencks materials several days before testifying witnesses took the stand. And the brothers "ha[ve] not provided any reason for us to conclude that the government's evidence" tending to show multiple conspiracies "prejudiced [their] ability to" cross-examine the government's witnesses or otherwise prepare a defense. *United States v. Emor*, 573 F.3d 778, 787 (D.C. Cir. 2009).

Second, the Indictment contains sufficient detail to permit the brothers "to plead it in the future as a bar to subsequent prosecutions," thereby protecting them from further prosecution for any "narrower and more limited" conspiracy "included" within the Indictment's broad scope. *Miller*, 471 U.S. at 131, 135. Accordingly, the brothers suffered no notice-related prejudice from the district court's refusal to give the requested instruction.

12

The brothers raise no other claims of prejudice. "Nor do we," reviewing the record on our own, "discern any of the kinds of prejudice that we typically associate with" the omission of a multiple conspiracies instruction. *Cross*, 766 F.3d at 6.

For starters, the record supports the jury's verdict: whatever else the government's evidence showed, it established that, at the very least, the brothers conspired "with each other" to traffic over five kilograms of cocaine into the United States, as alleged in the Indictment. Indictment, J.A. 457; *cf. Miller*, 471 U.S. at 131 (explaining no prejudice arises where "a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme"). Indeed, the brothers raise no challenge to the jury's verdict.

Nor did the brothers suffer any spillover prejudice—i.e., any risk that one brother's conviction impermissibly rested on evidence of the other's guilt or that evidence from one conspiracy "spill[ed] over onto the jury's assessment of another conspiracy." *Cross*, 766 F.3d at 7. As we have explained, no risk of spillover prejudice exists where the government tries only a handful of alleged co-conspirators and where the district court gives a clarifying instruction to the jury. *United States v. Celis*, 608 F.3d 818, 845–46 (D.C. Cir. 2010) (per curiam). That was the case here: the brothers were the only defendants tried and the district court specifically instructed the jury that "[e]ach defendant is entitled to have the issue of his guilt of the crime for which he's on trial determined from his own conduct and from the evidence which applies to him, as if he were being tried alone." Trial Tr. 34 (Mar. 17, 2016).

Thus, regardless of whether the district court should have given the multiple conspiracies instruction in the first place, no

prejudice arose from the charge's omission, dooming the brothers' instructional claim.

## III.

For the foregoing reasons, we affirm Eliu and Waldemar's convictions.

*So ordered.*