# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 11, 2013   Decided September 10, 2013

No. 11-3096

UNITED STATES OF AMERICA,
APPELLEE

v.

ELOHIM BEY CROSS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00281-11)

*Adam H. Kurland*, appointed by the court, argued the cause and filed the briefs for appellant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, and *John K. Han*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*:    Elohim Cross appeals his conviction for conspiring to distribute heroin.  He contends that the trial court erred in not giving a multiple conspiracies jury instruction, and that the prosecutor erred in making improper statements regarding multiple conspiracies in his rebuttal argument.  We conclude that, even if there were error, any such error was harmless.  We therefore affirm Cross' conviction.

I

In 2009, federal law enforcement authorities received a tip that a man named Mouloukou Toure was distributing heroin on a large scale in the Washington, D.C. area.  In the course of pursuing that lead, investigators tapped Toure's telephones.  Through those wiretaps, they learned that Toure's supplier was based in Toronto, Canada and operated under the alias "Big Brother."  They also learned that couriers delivered the heroin from Canada to Washington, D.C., where Toure served as a regional supplier to several lower-level distributors.

On the wiretap, the agents overheard a series of conversations between Toure and appellant Cross.  On several occasions, Cross used coded language to place narcotics orders.  Cross and Toure also discussed purchasing prepaid cell phones to escape detection by the police.  In one conversation, Toure told Cross about a police raid on a stash house where Toure had kept some of his drugs; Toure expressed concern that an individual arrested in the raid might become a police informant.  And, in a moment of supreme irony, the two shared their admiration for *The Wire*, an HBO television series about drug dealers being monitored by a wiretap.  Supp. App. 15 ("Yea season three is my favorite.").[1]

---

[1] *See The Wire* (Season Three) (HBO television broadcast Sept. 19 - Dec. 19, 2004).

Based on the intercepted conversations, the FBI staked out a Comfort Inn in Capitol Heights, Maryland. On October 3, 2009, an FBI agent watched Toure walk into the hotel and enter one of the elevators. "Seconds later," the agent testified, "the other elevator opened up, Mr. Cross came out, he looked around the lobby, . . . . [and] [t]hen he went back into the elevator and went up to the second floor." Trial Tr. 82 (July 19, 2011 a.m.). The agent hid in a stairwell on the second floor and, when he heard a door open, observed Toure walking out of Room 217. *Id.* at 83.

On the morning of November 4, 2009, an FBI agent visited the Comfort Inn. At his request, the hotel's manager gave him records confirming that Cross was staying in Room 217 and that he had stayed in the same room on October 3, 2009. The records also revealed that Cross had stayed at the hotel for weeks at a time throughout 2009 and that he paid exclusively in cash.

Later that morning, agents monitoring the wiretap overheard Cross calling Toure in a panic. There followed a conversation that could well have been written for *The Wire*. Cross told Toure that "I got a tip from the . . . front desk" that the hotel's manager gave an officer "a printout . . . of my whole time" in the hotel. Supp. App. 19. Cross said he had to send someone back to the hotel room "[b]ecause I still got things in there, you feel me, it's going to be hard to find but I got things in there . . . [Y]ou know what I'm sayin?" *Id*. at 20. To which Toure replied, "[y]eahhh, you got to be careful dawg." *Id.* A subsequent search of Room 217 unearthed a bag containing heroin and morphine hidden behind the faceplate of an electrical outlet; several small ziplock bags of heroin and cocaine base in the drawer of a nightstand; and an assortment of drug-related paraphernalia hidden elsewhere in the room, including numerous

plastic sandwich bags, a digital scale, disposable gloves, and surgical face masks.

In a call intercepted the day after the search, Cross told Toure: "I sent a couple of my home boys . . . to the room to get all my stuff," and they found a copy of a "search and seizure warrant." Supp. App. 24. Cross told Toure not to worry, because "I don't call nobody from this phone but you." *Id.* Cross said that he wanted to meet Toure "face to face cause right now this like . . . in the movie you know what I'm talking about?" *Id.* at 25.

In a single-count indictment, a grand jury charged that Cross, "Big Brother" (identified as Olayinka Johnson), and several other named individuals "did knowingly and willfully . . . conspire . . . together, and with other persons both known and unknown," to distribute and possess with intent to distribute a kilogram or more of heroin. App. 34-35. Cross alone went to trial. All of the others pled guilty, and Toure testified for the government. Toure told the jury that he sold heroin to Cross in amounts ranging from 50 to 200 grams, which, over time, totaled 1.2 to 1.3 kilograms. Trial Tr. 18-19 (July 19, 2011 p.m.); Trial Tr. 36, 48, 50 (July 21, 2011 a.m.). The deals often took place in Cross' room at the Comfort Inn, Toure said, where Cross had small ziplock bags and other paraphernalia for "bagging" the heroin for subsequent distribution. Trial Tr. 26-27 (July 19, 2011 p.m.). Toure testified that he told Cross that Big Brother was the heroin supplier; where Big Brother "was at, and where he was from"; and the quantities of heroin Big Brother was providing. *Id.* at 20. Toure also said that he and Cross discussed contributing $30,000 each so they could purchase a kilogram of heroin directly from Big Brother. *Id.* at 25.

Cross was convicted and sentenced to 240 months in prison. He appeals on two grounds, which we consider in the following two parts.

II

Before the close of trial, Cross asked the court to instruct the jury that it should not convict him if the evidence showed he had engaged in a buyer-seller conspiracy solely with Toure, rather than in the larger conspiracy charged in the indictment. Under Cross' theory, such an instruction was warranted because "the Government elicited from Toure a totally separate conspiracy" between Toure and Cross. Trial Tr. 27 (July 20, 2011 p.m.).

The trial court rejected Cross' request. The court ruled that "the real question is whether there's a factual . . . predicate justifying the jury instruction for multiple conspiracies." *Id.* at 24. The court found there was not. Reviewing the evidence presented at trial, the court noted that Big Brother was "the highest and only source of heroin in this charged conspiracy, [who] used couriers to deliver to Toure, who in turn was the one who distributed to, allegedly, Mr. Cross and others." *Id.* Given those facts, the court held that the evidence made out only one conspiracy, as the jury was allowed "to infer . . . interdependence . . . up and down the distribution chain." *Id.* at 25 (citing *United States v. Tarantino*, 846 F.2d 1384 (D.C. Cir. 1988)).

Although the court rejected Cross' proposed multiple conspiracies instruction, it granted his request for an instruction cautioning the jury that "a simple buyer/seller relationship alone does not make out a conspiracy, even where the buyer intends to resell the heroin." *Id.* at 51. The court instructed the jury to consider several factors in determining "whether a conspiracy or

a simple buyer/seller relationship existed," including "whether the transaction involved large quantities of heroin," "whether the parties had a standardized way of doing business over time," "whether the parties had a continuing relationship," "whether the seller had a financial stake in a resale by the buyer," and "whether the parties had an understanding that the heroin would be resold." *Id.*

On appeal, Cross argues that the court erred in denying his request for a multiple conspiracies instruction. As with any other theory-of-defense instruction, a multiple conspiracies instruction "is in order if there is sufficient evidence from which a reasonable jury could find for the defendant on his theory." *United States v. Moore*, 651 F.3d 30, 78-79 (D.C. Cir. 2011) (internal quotation marks omitted), *aff'd on other grounds sub nom. Smith v. United States*, 133 S. Ct. 714 (2013). Cross renews his argument that there was sufficient evidence because "the evidentiary record, fairly construed, supported the argument that [he] was part of a separate smaller conspiracy" with Toure, "not the one charged in the indictment." Appellant Br. 8. The government responds that the "trial evidence supported only the existence of the single conspiracy charged," Gov't Br. 16, "a chain conspiracy" that ran from Big Brother through Toure to Cross and other retail distributors, *id.* at 27.

We need not decide whether the district court erred in failing to give a multiple conspiracies charge if any such error was harmless. The harmless error rule provides that any error that "does not affect substantial rights must be disregarded." FED. R. CRIM. P. 52(a). This means that "the error must have been prejudicial" for Cross to win reversal, *United States v. Olano*, 507 U.S. 725, 734 (1993). And in a case like this, an error is not prejudicial unless it "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Baugham*, 449 F.3d 167, 174 (D.C. Cir. 2006) (quoting

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see United States v. Johnson*, 519 F.3d 478, 483 (D.C. Cir. 2008).

Cross proffers only one possible kind of prejudice stemming from the trial court's failure to instruct on his multiple conspiracies theory: the risk that he was convicted of the larger conspiracy charged in the indictment, when the only one he was guilty of beyond a reasonable doubt was a smaller one with Toure alone. Appellant Br. 8-9, 16-17. As counsel acknowledged at oral argument, this is essentially a claim of variance. *See* Oral Arg. Recording at 49:10; *see, e.g.*, *United States v. Mathis*, 216 F.3d 18, 23 (D.C. Cir. 2000).

It is reasonable to raise a variance claim in this context, because the purpose of a multiple conspiracies instruction is to protect against the risk of a prejudicial variance between the conspiracy charged in the indictment and the one proven at trial. *See United States v. Celis*, 608 F.3d 818, 845 (D.C. Cir. 2010); *United States v. Anguiano*, 873 F.2d 1314, 1317-18 (9th Cir. 1989); *United States v. Cambindo Valencia*, 609 F.2d 603, 625 (2d Cir. 1979). Accordingly, because we are assuming for purposes of argument that the district court erred in declining to give a multiple conspiracies charge, we will likewise assume that a variance involving multiple conspiracies occurred. *See Cambindo Valencia*, 609 F.2d at 606.

But not every variance between the crime charged and the crime proven is fatal to the validity of the resulting conviction. *Berger v. United States*, 295 U.S. 78, 81 (1935); *see United States v. Miller*, 471 U.S. 130, 131 (1985) (holding that "the Fifth Amendment's grand jury guarantee" is not "violated when a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme"). "The true inquiry," the Supreme

Court has said, "is not whether there has been a variance in proof, but whether there has been such a variance as to affect the substantial rights of the accused." *Berger*, 295 U.S. at 82. Once again, then, "the proper standard of review for the type of variance claimed here is the conventional one, articulated in *Kotteakos v. United States*, i.e., whether the error had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Baugham*, 449 F.3d at 174 (quoting *Kotteakos*, 328 U.S. at 776 (internal citation omitted)).

In short, a variance between a single conspiracy charged in an indictment and alleged multiple conspiracies proven at trial requires reversal of a conviction only if the defendant suffered prejudice as a consequence. *Mathis*, 216 F.3d at 25; *United States v. Gatling*, 96 F.3d 1511, 1519 (D.C. Cir. 1996); *United States v. Graham*, 83 F.3d 1466, 1471 (D.C. Cir. 1996); *Tarantino*, 846 F.2d at 1391. Hence, a showing of prejudice is required regardless of whether the alleged trial error is that the court failed to give a multiple conspiracies instruction, or simply that a variance occurred. *See United States v. Howard*, 115 F.3d 1151, 1157 (4th Cir. 1997) ("[F]ailure to give a multiple conspiracy instruction is not reversible error unless the defendants demonstrate that they have been prejudiced by the variance between the single conspiracy charged in the indictment and the multiple conspiracies proven at trial." (internal quotation marks omitted)).

So, what was the prejudice in this case? Cross' briefs do not proffer any. Nor do we do discern any of the kinds of prejudice that we typically associate with variances.

1. The alleged variance would, of course, be prejudicial if there were insufficient evidence for a reasonable jury to find Cross guilty of the conspiracy charged in the indictment beyond a reasonable doubt. *See Graham*, 83 F.3d at 1472. But Cross

does not dispute that there was sufficient evidence to support his conviction for membership in that conspiracy. *See* Appellant Br. 17; Appellant Reply Br. 4; Oral Arg. Recording at 5:20. Nor could he.

The government presented evidence of a typical "chain-type conspiracy common in narcotics cases," *Tarantino*, 846 F.2d at 1392 (internal quotation marks omitted). Here the chain ran from the principal supplier (Big Brother) through the middleman (Toure) to lower-level distributors (including Cross). As the evidence showed, Cross was a heroin dealer who received continuous, wholesale amounts of heroin from his immediate supplier, Toure, and then repackaged the heroin for retail sale. In *Tarantino*, we explained the legal implications of such a distribution arrangement:

> Under the chain analysis, the government need not prove a direct connection between all the conspirators. A single conspiracy may be established when each conspirator knows of the existence of the larger conspiracy and the necessity for other participants, even if he is ignorant of their precise identities. When the conspirators form a chain, each is likely to know that other conspirators are required. . . . The existence of a chain helps us determine both the unlawful objective and the conspirators' intent. . . . [E]ach link in the chain may rely upon the other links in furtherance of the common interest. The street dealer relies upon his supplier; the supplier relies upon *his* supplier; and so on. The existence of such a vertically integrated, loose-knit combination may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further

a common unlawful objective, e.g., the distribution of narcotics.

*Id.* at 1392; *see e.g.*, *United States v. Gaviria*, 116 F.3d 1498, 1516 (D.C. Cir. 1997); *United States v. Childress*, 58 F.3d 693, 709-10 (D.C. Cir. 1995).[2]

There is no dispute that Cross was "likely to know that other conspirators" beyond Toure were necessary for the success of the heroin venture, *Tarantino*, 846 F.2d at 1393.[3] As Cross' counsel acknowledged at oral argument: "Everybody knows that Toure -- he's not the Rumpelstiltskin of heroin -- he didn't turn straw into heroin -- everybody knows that it's coming from somewhere else." Oral Arg. Recording at 51:22. Indeed, Cross did not even have to *infer* the existence of a higher-level supplier; nor was he "ignorant of the[] precise identit[y]" of that supplier, *Tarantino*, 846 F.2d at 1393. To the contrary, Toure

---

[2]In *Tarantino*, we cautioned that:

Chain analysis must be used with care. Even in a vertically integrated combination, certain players may have performed activities *wholly unrelated* to the aims of the conspiracy. . . . Thus, even if we determine that a chain conspiracy exists, we may still conclude that certain actions were outside the chain and formed a separate conspiracy.

846 F.2d at 1393 (emphasis added). In this case, however, there is no evidence that the transactions between Cross and Toure were "wholly unrelated" to the aims of the conspiracy charged in the indictment.

[3]*See Tarantino*, 846 F.2d at 1398 ("The government was not obliged to prove that [the defendant] knew every detail of the conspiracy. All that is required is that the evidence establish that he knew others were involved and that his own benefits depended upon the success of the entire venture.").

told Cross that the heroin supplier was Big Brother; where Big Brother "was at, and where he was from"; and the quantities of heroin Big Brother was providing. Trial Tr. 20 (July 19, 2011 p.m.).

We conclude, as did the trial court, that there was sufficient evidence for the jury to convict Cross of the conspiracy charged in the indictment. *See* Sentencing Tr. 15 (Oct. 21, 2011). And "[b]ecause the evidence [of a single conspiracy] was sufficient, any variance from the indictment did not substantially prejudice the appellant[]," *Graham*, 83 F.3d at 1472; *see United States v. Stewart*, 104 F.3d 1377, 1382 (D.C. Cir. 1997). Or at least the alleged variance *alone* did not prejudice the appellant. The remaining question is whether the alleged variance led to any other kind of prejudice that "had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Baugham*, 449 F.3d at 174 (quoting *Kotteakos*, 328 U.S. at 776).

2. Other than insufficiency of the evidence, the most serious kind of prejudice that may stem from a variance between the conspiracy charged in an indictment and the evidence proven at trial is the problem of notice. This problem arises if the variance interferes with either of the two purposes served by a grand jury indictment:

> (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.

*Berger*, 295 U.S. at 82; *see Miller*, 471 U.S. at 134-35.

But there was no notice problem here, as there rarely (if ever) will be if the trial proof "supports only a significantly narrower and more limited" charge than that stated in the indictment. *Miller*, 471 U.S. at 131. Cross was clearly on notice that he would need to defend against the charge that he agreed with Toure to distribute heroin, because his transactions with Toure were part of the proof of both of the two conspiracies that Cross posits. Indeed, Cross' opening statement to the jury made clear he understood the risk that the evidence would show, and the jury would find, that he had an agreement with Toure. *See* Trial Tr. 33 (July 19, 2011 a.m.). Nor is there any doubt that the indictment was "sufficient to allow [Cross] to plead it in the future as a bar to subsequent prosecutions." *Miller*, 471 U.S. at 135. Accordingly "none of these 'notice' related concerns -- which of course are among the important concerns underlying the requirement that criminal charges be set out in an indictment," *id.* -- suggest that Cross suffered prejudice from the variance he asserts.

3. Another kind of prejudice that is typically at issue in variance cases is "the risk of 'transference of guilt from one [defendant] to another across the line separating conspiracies, subconsciously or otherwise.'" *Baugham*, 449 F.3d at 175 (quoting *Kotteakos*, 328 U.S. at 774). But because Cross "was tried alone, his is not a case in which the number of defendants and conspiracies tried together created a danger that, due to 'spillover' effects, appellant might be found guilty based on evidence properly admitted only against someone else." *Stewart*, 104 F.3d at 1382; *see Anguiano*, 873 F.2d at 1318 ("[T]here is no problem of spillover when . . . the defendant stands trial alone.").

4. A related kind of "spillover" prejudice is the risk that evidence of one conspiracy will spill over onto the jury's assessment of another conspiracy. *See Tarantino*, 846 F.2d at

1391. Cross did not make this argument in his briefs. His effort to assert it for the first time at oral argument, Oral Arg. Recording at 22:53, 45:02, comes too late. *See United States v. Southerland*, 486 F.3d 1355, 1360 (D.C. Cir. 2007) (holding that a contention first raised at oral argument is forfeited).

In any event, it is unclear what the spillover argument means in a case like this. Cross cryptically suggested at oral argument that there was a "spillover" of evidence from the "Canada conspiracy" -- i.e., the charged conspiracy that included Big Brother, whose base was in Canada. Oral Arg. Recording at 45:45. But onto what did that evidence "spill"? The answer would have to be the allegedly separate conspiracy between Cross and Toure. But whether or not that conspiracy was truly "separate," the evidence that Cross was engaged in a conspiracy with at least Toure was so strong -- indeed, Cross essentially concedes the point, *see* Oral Arg. Recording at 48:16 -- that it is hard to see how any spillover could have materially affected the jury's view of Cross' culpability for that conspiracy.[4]

Finally, and most important, this particular spillover argument is not really relevant to the gravamen of the claim Cross raises on this appeal. Cross' claim is not that he was wrongly convicted of the alleged Toure conspiracy, but that he

---

[4]Moreover, any danger of spillover prejudice was largely eliminated by the government's introduction of wiretap recordings in which Cross directly implicated himself in the conspiracy. *See Celis*, 608 F.3d at 846 (holding that "the risk of prejudicial spillover is minimal" when the government presents tape recordings of a defendant discussing criminal acts, "because the jury has no need to look beyond each defendant's own words in order to convict" (internal quotation marks omitted)); *see also Gaviria*, 116 F.3d at 1533; *Mathis*, 216 F.3d at 25.

was wrongly convicted of the indicted conspiracy. And yet he offers no argument at all that evidence of the former improperly "spilled over" onto the latter.

\* \* \*

In sum, even if we assume the district court erred in failing to give a multiple conspiracies instruction, and even if we assume that failure produced a variance, reversal of Cross' conviction remains unwarranted. Variance is grounds for reversal only if it prejudiced the defendant, and we discern no prejudice here.

### III

Cross' second contention is that the prosecutor made improper remarks during his rebuttal argument. The trial court had instructed defense counsel not to argue a multiple conspiracies theory during closing arguments. *See* Trial Tr. 62-63 (July 20, 2011 p.m.). According to Cross, the government took unfair advantage of this limitation when it argued that, "for the purpose of finding [Mr. Cross] guilty of the crime charged, all you need is two, Mr. Cross plus one other person, Mr. Toure," Trial Tr. 47 (July 21, 2011 a.m.); that "in this case we can prove simply Mr. Cross got in an agreement with one other person -- that's two -- in this case Mouloukou Toure," *id*.; and that the jury should "focus on the conspiracy, just two or more people, between Mr. Toure and Mr. Cross," *id.* at 52. *See* Appellant Br. 21-22.

Once again, we need not determine whether the prosecutor's argument was improper if the asserted error did not cause the defendant to suffer prejudice. *Moore*, 651 F.3d at 50. Cross does not dispute that, at least theoretically, the prosecutor's "you only need two" argument "correctly state[s]

the law" of conspiracy. *See* Appellant Br. 22; Oral Arg. Recording at 11:49. Cross does maintain that, in context, the prosecutor's statements were prejudicial because they suggested that the jury could convict him of the charged conspiracy notwithstanding that he was only guilty of the separate conspiracy with Toure. Appellant Br. 25. But that is the same "fatal variance" argument that we considered and dismissed in Part II. We dismiss it again here on the same basis.

## IV

For the foregoing reasons, the judgment of the district court is

*Affirmed.*