# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 26, 2014      Decided February 27, 2015

No. 11-3067

UNITED STATES OF AMERICA,
APPELLEE

v.

HEYWARD CARZELL SANDERS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cr-00165-4)

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Neil H. Jaffee*, Assistant Federal Public Defender, entered an appearance.

*Stephen F. Rickard*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Kenneth F. Whitted*, and *David Kent*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Heyward Sanders appeals his conviction for conspiracy to distribute heroin. He contends that the trial court erred by foreclosing a request for hybrid legal representation, by denying his request for a multiple conspiracies jury instruction, and by failing to give an adequate response to a note from the jury. For the reasons set forth below, we affirm the judgment of the district court.

I

In November 2008, law enforcement authorities began to investigate narcotics activity in and around Potomac Gardens, a housing project in the District of Columbia. In August 2009, agents obtained a wiretap on a telephone owned by Matthew Joseph, a former Potomac Gardens resident known to his associates as Fat Mack. The agents learned that Joseph coordinated a network of people distributing heroin, suboxone pills, and crack cocaine. Among his associates were "lieutenants" who helped him procure narcotics and prepare them for distribution, and "runners" who sold narcotics on the street.[1]

In October 2009, a mutual acquaintance described appellant Heyward Sanders to Joseph as a potential supplier of high-quality heroin. Joseph received an initial test sample, which his associates described as "some of the best heroin that they had around that area in a long time." 4/28 Trial Tr. 44. After a night of gambling, Joseph asked his acquaintance to set up a deal with Sanders, and the three of them met at a shopping center in

---

[1]The facts recited in this and the following four paragraphs come from wiretaps that were admitted into evidence, and/or Matthew Joseph's trial testimony.

Greenbelt, Maryland on October 10. Joseph purchased 200 grams of heroin from Sanders for $15,000.

After this first transaction, Joseph dealt directly with Sanders. The following day, Sanders warned Joseph that he (Sanders) had a "lot of eyes" on him, but he agreed to meet Joseph in an alley behind a school near Potomac Gardens. App. 212-14; *see* 4/28 Trial Tr. 61-63. Joseph purchased heroin from Sanders five more times. Twice, he purchased 100 grams from Sanders at the Greenbelt shopping center, paying $7500 on the first occasion and $7000 on the second. Later in October, Sanders began obtaining heroin from a new source and provided Joseph with test samples. On October 27, Joseph told Sanders he was out of heroin, and the two agreed to meet near the same school. There, Sanders sold Joseph six grams of heroin, "fronting" the drugs on credit. 4/28 Trial Tr. 47. Joseph later paid $100 per gram, higher than the usual price because the drugs were from Sanders' personal supply. That evening, Joseph told Sanders that the heroin was weaker than the initial batch.

The wiretap on Joseph's telephone recorded a number of conversations with Sanders in late October and November. On an unknown date during that period, Joseph and Sanders again met near Potomac Gardens, and Joseph bought another 50 grams of heroin for $4000. In their final transaction in December 2009, Joseph purchased 25 grams for $2250. Joseph testified at trial that the quality of Sanders' heroin had been deteriorating over time, and that he stopped purchasing heroin from Sanders because Sanders no longer had any available.

Joseph's telephone conversations revealed that Sanders was not his only heroin supplier. Around the same time, he was also dealing with another supplier, Joseph Richardson. In a December 10 transaction monitored by law enforcement, Joseph

purchased 50 grams of heroin from Richardson for $3500. Police officers stopped Richardson after the sale and seized the cash, prompting Richardson to call Joseph to complain.

In late December 2009, agents obtained a wiretap on Sanders' phone. On March 15, 2010, when he was no longer selling heroin to Joseph, Sanders had a conversation with James Leak, with whom Sanders had also made heroin deals. Leak mentioned that a man named "Fat somebody" had been "doing real good for the last two years" in Potomac Gardens. App. 165. Sanders, aware of Joseph's nickname, responded, "You talking about Fat Mack?" *Id.* When Leak continued describing Fat Mack's success in Potomac Gardens, Sanders twice told Leak that Fat Mack "use[d] to purchase from you." *Id.* at 166.

Officers searched Sanders' house on May 13, 2010. On June 15, a grand jury returned an indictment against Sanders and eight others. Sanders was named only in Count One, which charged all nine codefendants with conspiring to distribute and possess with intent to distribute cocaine, 50 grams or more of crack cocaine, and 100 grams or more of heroin. All eight of Sanders' codefendants pled guilty, and Joseph testified as a cooperating witness at Sanders' trial. Sanders represented himself at trial, with standby counsel available. He did not testify and did not present evidence in his defense.

The jury convicted Sanders of conspiring to distribute and possess with intent to distribute 100 grams or more of heroin; it acquitted him as to cocaine and crack cocaine. Sanders raises three principal challenges on appeal, to which we now turn.

II

Sanders first contends that the district court erred by sua sponte instructing him that he did not have a right to hybrid

representation -- an arrangement in which he could represent himself while also allowing his counsel to participate in the trial.

Shortly before trial, Sanders expressed a desire to represent himself, and his pretrial counsel accordingly filed a motion to withdraw.  At the motions hearing, the district court "strongly urge[d]" Sanders to allow his lawyer to continue representing him, without success.  Supp. App. 115.  Among other things, the court told Sanders that, if he represented himself, he could get help from standby counsel.  But under that arrangement, the court said, such counsel "could not actively participate in the trial," and Sanders would be responsible for organizing his defense, picking a jury, calling witnesses, and making arguments.  *Id.* at 94-95.  After asking again whether Sanders wished to waive his right to counsel, the court found that Sanders had "knowingly and voluntarily" waived that right.  *Id.* at 117.  It then reiterated to Sanders the responsibilities of self-representation.  It advised Sanders that his counsel would serve on a "standby" basis, that Sanders would be able to consult with his standby counsel on "basic courtroom mechanics and routine clerical procedural matters," but that Sanders would have to make motions, argue issues, select the jury, question witnesses, and make objections himself.  *Id.* at 118-19.  Addressing Sanders, the district court said:  "You do not have the right to a hybrid representation by which you represent yourself and ask [your counsel] also to represent you and make some arguments for you.  You cannot do that."  *Id.* at 118.  Neither Sanders nor his pretrial counsel objected during the hearing.

Sanders' standby counsel remained available throughout the trial, and, at least twice, the district court ensured that Sanders had consulted with counsel on particular issues or advised him to do so.  *See* 4/28 Trial Tr. 187-88; 5/3 Trial Tr. 6-7.  Sanders never requested or expressed an interest in hybrid representation.  On appeal, Sanders claims that the district court

"erred in informing Sanders he had no right *to request* hybrid representation under any circumstances" -- "no right *even to ask* the district court in its discretion to allow counsel to represent him in part." Sanders Br. 26 (emphasis added).

Because Sanders did not object to the district court's statements, and never indicated an interest in hybrid representation, we review his claim for plain error only. FED. R. CRIM. P. 52(b). This means that Sanders has the burden of showing there is "'(1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Simpson*, 430 F.3d 1177, 1183 (D.C. Cir. 2005) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal citations and quotation marks omitted)). In most cases, to affect the defendant's substantial rights, "'the error must have been prejudicial: It must have affected the outcome of the district court proceedings.'" *Id.* at 1183-84 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)); *see United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014).

But the standard of review does not matter here because Sanders' claim fails at the first step: there was no error at all. The district court did *not* instruct Sanders that he had no right "even to ask" for hybrid representation. Instead, it simply told him that he did "not have the right to a hybrid representation." Supp. App. 118. That instruction correctly stated the law. *See McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) ("*Faretta* [*v. California*, 422 U.S. 806 (1975), the case establishing the right of a defendant to conduct his own defense,] does not require a trial judge to permit 'hybrid' representation . . . ."); *United States v. Washington*, 353 F.3d 42, 46 (D.C. Cir. 2004) ("A defendant does not have a right to combine self-representation

with representation by counsel."); *United States v. Tarantino*, 846 F.2d 1384, 1419-20 (D.C. Cir. 1988) (holding that there is no constitutional right to hybrid representation, and affirming a conviction where the trial court told the defendant "that *he had to choose* between representing himself and being represented by appointed counsel" (emphasis added)).

## III

Sanders next contends that the district court erred in denying his request for a multiple conspiracies jury instruction. Before Sanders' pretrial counsel withdrew from representation, he had requested a conspiracy charge that would have instructed the jurors to acquit if they found "that the defendant was only a member of some other conspiracy, and not a member of the conspiracy charged in the indictment." App. 143. At the close of all the evidence, Sanders verbally renewed this request. The district court denied the request, finding that the testimony did not support the existence of other conspiracies. 4/29 PM Trial Tr. 6. Sanders acknowledges that, at the time he made his request, he did not identify for the court the other conspiracies that he believed were supported by the evidence. Oral Arg. Recording at 41:40-43:14.

A district court must, if requested, give a multiple conspiracies instruction when the "record evidence supports the existence of multiple conspiracies." *United States v. Graham*, 83 F.3d 1466, 1472 (D.C. Cir. 1996). The factors relevant to determining whether there was a single conspiracy rather than multiple conspiracies include "'whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan.'" *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 207 (D.C. Cir. 2013) (quoting *United States v. Brockenborrugh*, 575 F.3d 726, 737 (D.C. Cir. 2009)). On appeal, Sanders argues

that the record evidence supported a finding of four separate and independent conspiracies: (1) a solely Joseph-Sanders conspiracy, (2) a Joseph-Richardson conspiracy, (3) a Sanders-Leak conspiracy, and (4) a conspiracy among Joseph and his associates in Potomac Gardens.

For purposes of argument, we will assume that Sanders is correct that the district court was required to give a multiple conspiracies instruction in this case. We will also assume, again for argument's sake, that there was a variance between the single conspiracy charged in the indictment and evidence at trial that supported a finding of multiple conspiracies. *See Berger v. United States*, 295 U.S. 78, 81 (1935); *United States v. Cross*, 766 F.3d 1, 5 (D.C. Cir. 2013).

Nonetheless, neither of these related (assumed) errors warrants automatic reversal. When a district court erroneously rejects a request for a jury instruction, the "harmless error rule provides that any error that 'does not affect substantial rights must be disregarded.'" *Cross*, 766 F.3d at 4 (quoting FED. R. CRIM. P. 52(a)). The same standard governs our determination of whether a variance in proof is fatal to the defendant's conviction. *See Berger*, 295 U.S. at 82 ("The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused."). Although Sanders advances several theories of prejudice, we are ultimately unconvinced.

A

One type of prejudice that may arise in variance cases is the possibility that, although the evidence showed the existence of multiple conspiracies, it was insufficient to convict the defendant of the conspiracy charged in the indictment. *See Cross*, 766 F.3d at 5. But in this case, even assuming that the

evidence supported a finding of multiple conspiracies, it was also "sufficient to permit the jury to find beyond any reasonable doubt that the defendant was a member of the single conspiracy alleged," *United States v. Thompson*, 76 F.3d 442, 454 (2d Cir. 1996); *see Cross*, 766 F.3d at 5.

As Sanders notes, "[t]he government sought to prove the existence of a single conspiracy, centered in Potomac Gardens . . . and headed by Matthew Joseph." Sanders Br. 28. The government provided more than enough evidence for the jury to conclude that Sanders agreed to join that conspiracy. In six transactions over a period of three months, Sanders supplied Joseph with significant quantities of heroin -- a total of approximately 481 grams -- in exchange for a total of $36,350. Because that was far more than a single person would use for his own consumption over that period,[2] the jury could reasonably infer Sanders understood that the drugs would be redistributed and that those subsequent sales were what generated the demand for his product. *See United States v. Childress*, 58 F.3d 693, 712 n.4, 714 (D.C. Cir. 1995) (holding that the large quantity of drugs involved supported the jury's conclusion that defendants knew the scope of the conspiracy); *see also United States v. Baugham*, 449 F.3d 167, 171-73 (D.C. Cir. 2006); *United States v. Gaviria*, 116 F.3d 1498, 1517 (D.C. Cir. 1997).

Sanders also supplied Joseph with test samples of the heroin before requiring payment -- another fact "indicat[ing] his comprehension that resale might have been contemplated." *United States v. Sobamowo*, 892 F.2d 90, 94 (D.C. Cir. 1989); *see Gaviria*, 116 F.3d at 1517 n.20. In addition, Sanders sold six grams of heroin to Joseph on credit, suggesting a "level of mutual trust" consistent with a conspiracy, *Baugham*, 449 F.3d

---

[2]One trial exhibit suggested that a single gram of heroin could be broken up into 40 individual servings. *See* App. 161.

at 173. The jury could also have interpreted Sanders' comment to Joseph, that Sanders had a "lot of eyes" on him, App. 213, as a warning to Joseph about the presence of police surveillance -- another indication of shared trust. *See Graham*, 83 F.3d at 1471-72. Finally, a jury could have understood Sanders' subsequent telephone conversation with Leak, in which Sanders told Leak that Fat Mack (Joseph) "use[d] to purchase from you" for his Potomac Gardens operation, App. 166, as evidence that Sanders had always understood that heroin he obtained from Leak and supplied to Joseph was being distributed in Potomac Gardens by Joseph's crew. Together, this evidence was more than sufficient to permit the jury to conclude that Sanders "had the 'specific intent to further the . . . objective'" of the Potomac Gardens conspiracy and therefore was a member of that conspiracy, *United States v. Gaskins*, 690 F.3d 569, 577 (D.C. Cir. 2012) (quoting *Childress*, 58 F.3d at 708).

Sanders' principal challenge to this conclusion is that he did not know the other members of the conspiracy. The Leak conversation casts doubt on that claim, but even if it were true, it would not be dispositive: participants in a drug-distribution chain are generally considered coconspirators "even if they do not all know one another, so long as each knows that his own role in the distribution of drugs and the benefits he derives from his participation depend on the activities of the others." *Childress*, 58 F.3d at 709-10; *see Lopesierra-Gutierrez*, 708 F.3d at 207 ("'[T]here is no requirement that each conspirator [even] know the identity of every other conspirator.'" (quoting *United States v. Jenkins*, 928 F.2d 1175, 1178 (D.C. Cir. 1991))). As we have repeatedly explained:

> Under the chain analysis, the government need not prove a direct connection between all the conspirators. A single conspiracy may be established when each conspirator knows of the existence of the larger

conspiracy and the necessity for other participants, even if he is ignorant of their precise identities. When the conspirators form a chain, each is likely to know that other conspirators are required. . . . The existence of a chain helps us determine both the unlawful objective and the conspirators' intent. . . . [E]ach link in the chain may rely upon the other links in furtherance of the common interest. The street dealer relies upon his supplier; the supplier relies upon *his* supplier; and so on. The existence of such a vertically integrated, loose-knit combination may raise the inference that each conspirator has agreed with the others (some whose specific identity may be unknown) to further a common unlawful objective, e.g., the distribution of narcotics.

*Cross*, 766 F.3d at 6 (quoting *Tarantino*, 846 F.3d at 1392); *see, e.g.*, *Gaviria*, 116 F.3d at 1516; *Childress*, 58 F.3d at 709-10. In this case, the government presented sufficient evidence to show that Sanders was, understood he was, and intended to be, part of the Potomac Gardens conspiracy.

B

Sanders argues that another form of prejudice arising from the court's failure to provide a multiple conspiracies instruction was the risk that the jury was not unanimous as to whether he joined the particular conspiracy charged in the indictment. Although some jurors might have found him liable based on the Potomac Gardens conspiracy, Sanders speculates that others might have found him liable for an independent Joseph-Richardson conspiracy, an independent Sanders-Leak conspiracy, or an independent Sanders-Joseph conspiracy. *See* Sanders Br. 38.

As the government notes, the jury's unanimous finding on the verdict form -- that Sanders was responsible (and only responsible) for conspiring to distribute 100 grams or more of heroin, *see infra* Part IV -- makes it implausible that some jurors found him liable for a Sanders-Leak conspiracy. Because there was no evidence at all about the quantity of heroin that Leak sold to Sanders, *see* Oral Arg. Recording at 5:48-6:06 (statement of Sanders' counsel), there is no reason to believe that the jury convicted Sanders of a separate conspiracy with Leak alone. *Cf.* Sanders Br. 38 (acknowledging that, "[i]f some jurors found Sanders liable for conspiring with Leak and not Joseph, they had no evidence to support a finding that the offense involved more than 100 grams of heroin"). Similarly, there is no reason to believe that the jury found Sanders liable for a separate Joseph-Richardson conspiracy, as there was no evidence that Sanders played any role in any Joseph-Richardson transactions (except to the extent that all three were members of the larger Potomac Gardens conspiracy).

That leaves only the possibility that some jurors convicted Sanders of a conspiracy solely with Joseph, rather than the Potomac Gardens conspiracy charged in the indictment. But even if jurors had found a Sanders-Joseph conspiracy, that conspiracy would merely have been a subset of the larger charged conspiracy. And it is well settled that there is generally no prejudice when the government proves a narrower conspiracy that is within the scope of the conspiracy charged in the indictment. The Supreme Court made this point in *Berger v. United States*, noting that there is no fatal variance when "an indictment charges a conspiracy involving several persons and the proof establishes the conspiracy against some of them only." 295 U.S. at 81. Subsequent cases have reached the same conclusion. *See United States v. Carnagie*, 533 F.3d 1231, 1241 (10th Cir. 2008) ("When a narrower scheme than the one alleged is fully included within the indictment and proved, we have

repeatedly held that a defendant's substantial rights are not prejudiced."); *see also United States v. Mansoori*, 304 F.3d 635, 656-57 (7th Cir. 2002) ("Even if the jurors were of different minds as to the precise parameters of the conspiracy, the instruction required them all to agree that the defendant joined a conspiracy that was within the ambit of the conspiracy alleged in the indictment.").

In this case, the court told the jury that the indictment contained the charges against the defendant, and then went on to read the indictment, which charged Sanders with conspiring with the other members of the Potomac Gardens crew. 4/27 Trial Tr. 13-16. In its arguments, the government likewise only asked the jury to convict Sanders of the Potomac Gardens conspiracy. Indeed, as Sanders acknowledges, "[i]n both opening and closing arguments, the government focused on 'the drug trafficking network operated by Matthew Joseph in and around the area of Potomac Gardens.'" Sanders Br. 20 (quoting 4/29 PM Trial Tr. 47 (government's closing argument), and citing 4/27 Trial Tr. 28-40 (government's opening argument)); *see* Sanders Br. 20-21 ("'[T]he conspiracy involved distributing large quantities of heroin and other drugs in Potomac Gardens.'" (quoting 4/29 PM Trial Tr. 49 (government's closing argument))). It is more than reasonable to conclude that the jury focused its attention on the conspiracy that the court and the government said was at issue. The government has therefore carried its burden of demonstrating that prejudice with respect to a non-unanimous jury did not result from the (assumed) error. *Simpson*, 430 F.3d at 1184.

C

Finally, other forms of prejudice that may stem from a variance between the charged conspiracy and the evidence proven at trial were also absent in this case. First, Sanders had

ample notice of the scope of the evidence that would be used against him at trial. All of the relevant conspirators were named in the indictment, and the government disclosed all of the recorded telephone calls before trial. *See Cross*, 766 F.3d at 7 (noting that "there rarely (if ever) will be [a notice problem] if the trial proof 'supports only a significantly narrower and more limited' charge than that stated in the indictment" (quoting *United States v. Miller*, 471 U.S. 130, 131 (1985))). Second, the risk of "transference of guilt from one [defendant] to another across the line separating conspiracies," *Kotteakos v. United States*, 328 U.S. 750, 774 (1946), was minimal. Sanders was tried alone, and much of the evidence against him consisted of his own words on the wiretaps. *See Cross*, 766 F.3d at 7-8 & n.4; *United States v. Mathis*, 216 F.3d 18, 25 (D.C. Cir. 2000); *see also Gaviria*, 116 F.3d at 1533.[3]

\* \* \*

In sum, even assuming that the district court erred in failing to give a multiple conspiracies instruction, the error did not prejudice Sanders and does not warrant reversal.

IV

Sanders also challenges the district court's instructions on drug quantity, as well as its response to a note from the jury regarding the verdict form. Sanders did not object to either at trial. We therefore review the court's statements for plain error only.

The district court initially charged the jury that:

---

[3]Sanders contends that various other pieces of evidence created prejudicial spillover. We have considered that evidence and conclude that the contention is without merit.

> [T]he specific amount of any controlled substance involved is not an element of the offense of conspiracy. So first you have to determine the conspiracy.
>
> However, if you find the defendant guilty of the offense of conspiracy to distribute or possess with intent to distribute a controlled substance as charged in the indictment, you must then determine whether the government has proved the quantity of the controlled substance was[:] . . . a detectable amount of cocaine; or 50 grams or more of . . . cocaine base, that is crack; or 100 grams or more of . . . heroin.

4/29 Trial Tr. 37-38. As this court has previously noted, 21 U.S.C. § 841, the federal drug distribution offense, "'is a tripartite statute that [effectively] establishes separate offenses based on drug quantity" and type. *United States v. Gibson*, 353 F.3d 21, 29 (D.C. Cir. 2003) (citing *United States v. Webb*, 255 F.3d 890, 898 (D.C. Cir. 2001)). "[D]rug quantity is an element of the offense under § 841(b)(1)(A) and (b)(1)(B) and must be submitted to the jury." *Gibson*, 353 F.3d at 29. It is not, however, an element of the base offense of distributing a controlled substance, 21 U.S.C. § 841(b)(1)(C), or of conspiring to do so, *id.* § 846. *See Webb*, 255 F.3d at 897.

Consistent with the jury instruction, the district court provided a verdict form that first asked the jury to indicate whether it found Sanders guilty or not guilty of the base charge of conspiracy to distribute and possess with intent to distribute a controlled substance -- "Cocaine, or Cocaine Base, also known as Crack, or Heroin." App. 277. "If you find Mr. Sanders 'not guilty'" of that charge, the form went on, "then your deliberations are complete." *Id.* "If, however, you find Mr. Sanders 'guilty' of [that charge], then you must determine . . . whether the government has proven beyond a reasonable

doubt" that the conspiracy involved Sanders' agreement to distribute or possess with intent to distribute one or more of the following:  (i) a detectable amount of cocaine; (ii) 50 grams or more of crack cocaine; or (iii) 100 grams or more of heroin.  App. 277.  On page 2 of the form, the jury was given yes or no options for each of those three.  App. 278.

After deliberations began, the jurors sent the district court a note asking whether, if they found Sanders guilty of conspiracy, they also had to "answer yes to at least 1 of the questions on page 2 of the verdict form."  App. 274.  The district court discussed the note with Sanders and the prosecutor.  Sanders pointed the court to the paragraph in the initial instructions stating that a specific amount of drugs is not an element of the conspiracy offense.  *See* 5/3 Trial Tr. 9.  The court then summoned the jury and responded to its question as we will soon describe.

At bottom, Sanders complains that the district court's response left "the jury unsure as to whether a complete verdict required answering 'yes' to at least one of the identified drug quantities."  Sanders Br. 59.  The verdict form -- by providing yes or no options for each of the identified quantities -- made it clear that the jury did not have to answer "yes" to complete the verdict.  And we do not think that the court's response to the jury's note muddied the waters.

First, the district court reminded the jurors that, as it had told them in its initial instructions, "the specific amount of any controlled substance involved is not an element of the offense of conspiracy. "  5/3 Trial Tr. 11.  Only "if you find the defendant guilty of the offense of conspiracy to distribute . . . a controlled substance," the court said, "must [you] then determine *whether* the government has proved the quantity of controlled substance."  *Id.* at 12 (emphasis added); *see id.* at 13.  "And

then," the court continued, "you answer yes *or no* on the [second] page, and if you cannot agree, then you cannot agree on that part of the verdict." *Id.* at 13 (emphasis added). Finally, the court told the jury that its verdict as to each quantity had to be unanimous: "[T]o answer yes *or no* to any one of [the quantities,] you have to have a unanimous verdict." *Id.* (emphasis added). This response clearly and accurately reiterated the earlier instructions and did not confuse the jury.

V

In this Part, we address a number of Sanders' miscellaneous claims of error that he did not raise in the district court. Although he attempts to trace these claims to the absence of the multiple conspiracies jury instruction that he did request in that court, *see supra* Part III, we are unable to connect the dots. We therefore briefly review them as stand-alone claims subject to plain error review.

A

In addition to failing to give the multiple conspiracies instruction, Sanders maintains that the district court erred in failing to give two additional conspiracy-related instructions that he did not request. First, he objects that the district court's instructions did not adequately define the crime of conspiracy. He recognizes, however, that the instructions were consistent with circuit precedent describing the elements of conspiracy. *See* Sanders Reply Br. 21 (acknowledging consistency with descriptions in *Graham*, 83 F.3d at 1471, and *United States v. Lam Kwong-Wah*, 924 F.2d 298, 303 (D.C. Cir. 1991)). The fact that the district court did not sua sponte "adopt[] a more

comprehensive set of elements for showing drug conspiracy," Sanders Br. 36, did not constitute plain error.[4]

Second, Sanders contends that the district court should have instructed the jury that a simple buyer-seller relationship alone does not constitute a conspiracy.[5] Although such an instruction would have added clarity to the general conspiracy instruction, the government would then have been entitled to a further instruction that a buyer-seller relationship, combined with other evidence, can prove knowing participation in a conspiracy, *see United States v. White*, 116 F.3d 903, 928 n.11 (D.C. Cir. 1997) (citing *United States v. Baylor*, 97 F.3d 542, 547 (D.C. Cir. 1996)). That is, a jury may properly find a conspiracy, rather than a buy-sell agreement, "where the evidence shows that a buyer procured [or a seller sold] drugs with knowledge of the overall existence of the conspiracy." *United States v. Thomas*, 114 F.3d 228, 241 (D.C. Cir. 1997). Among the factors demonstrating such knowledge are the existence of repeated, regular deals; drug quantities consistent with redistribution; and the extension of credit to the buyer. *See Cross*, 766 F.3d at 4;

---

[4]Sanders argues that this issue should not be reviewed for plain error because his counsel had proposed a conspiracy charge with more elements than the district court listed. *See* Sanders Reply Br. 22 n.4. But the additional element that he proposed is not the one he argues for here. *Compare* App. 140 (proposed charge), *with* Sanders Br. 36-37 (citing Third Circuit and Tenth Circuit definitions of conspiracy, but not indicating which he would prefer).

[5]Although he acknowledges that he did not request such an instruction, Sanders contends that, "had the district court recognized the need" for the multiple conspiracies instruction that he did request, "it would have understood that a 'buy/sell' one was also required." Sanders Br. 43. Sanders offers no support for this contention, and it does not suffice to change the standard of review from plain to harmless error.

*Baugham*, 449 F.3d at 171-72; *Baylor*, 97 F.3d at 547; *see also United States v. Medina*, 944 F.2d 60, 65-66 (2d Cir. 1991) (stating that the "rationale for holding a buyer and a seller not to be conspirators" does not apply when "there is advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use").

As we set out in Part I and discussed in Part III, all of these factors were present in this case. As a consequence, Sanders has not satisfied his burden of showing that the absence of a buyer-seller instruction "affected the outcome of the district court proceedings," *Simpson*, 430 F.3d at 1183-84 (quoting *Olano*, 507 U.S. at 734). *See United States v. Hoyte*, 330 F. App'x 248, 250 (2d Cir. 2009) (holding that "[n]o plain error can be found" in the failure to give a buyer-seller instruction where "the government presented ample evidence beyond a mere buyer-seller relationship and demonstrated that defendant engaged in more than a single transaction").

B

Sanders also contends that the court erred in sending back to the jury a compact disc that contained some unplayed recordings of wiretapped telephone calls "not in evidence." Sanders Br. 48. But there was no such error. The parties had entered into a stipulation permitting all of the calls to be admitted into evidence subject to subsequent, specific objections about particular calls. 4/27 Trial Tr. 100-07. And Sanders never raised any objections at all.

C

Finally, we reject Sanders' contention that plain error arose during each side's closing arguments to the jury.

Sanders claims that the trial court improperly prevented him from arguing that he made "little money from the drug trade," which he maintains "was relevant to whether he was involved in a conspiracy with Joseph." Sanders Br. 52. But the court did not improperly limit him. The court permitted Sanders to remind the jury of a photograph of the search of his house, showing that he slept on a cot between the living room and dining room. It stopped him only when he began arguing that the house belonged to his family rather than to him, and that they let him stay there without paying rent -- a point, he said, that "was part of the case on the search and seizure." 4/29 PM Trial Tr. 79. The court properly cut this argument off, both because the validity of the search was "not an issue" at the trial, and because there was "no evidence" regarding the nonpayment of rent. *Id.*; *see Childress*, 58 F.3d at 715 (holding that a party may not use closing arguments to "argue facts not in evidence").

Nor did the prosecutor plainly err in arguing that one of Sanders' sales of a large quantity of heroin to Joseph "by itself" established Sanders' participation in the conspiracy, 4/29 PM Trial Tr. 51. Even if Sanders is correct that a single sale would be insufficient to establish a conspiracy, he challenges only a single reference in the prosecutor's closing argument. The remainder of that argument called the jury's attention to the myriad of other evidence that showed Sanders' involvement in the conspiracy, and stressed the fact that he sold Joseph heroin on six different occasions. *See, e.g.*, *id.* at 53-57. We do not believe that the prosecutor's single statement affected the outcome of the trial. *See Williams*, 773 F.3d at 107.[6]

---

[6]Sanders raises a number of additional miscellaneous arguments or variants of the arguments discussed in the text. We have concluded that they are without merit and do not warrant further discussion.

## VI

For the foregoing reasons, the judgment of the district court is

*Affirmed*.